# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| VALENTINA SORESCU, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 1:15 C 10317 |
| v. ) | Hon. Marvin E. Aspen |
| ) | |
| TRISTA HARPER, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

MARVIN E. ASPEN, District Judge:

Plaintiff Valentina Sorescu, a Chicago Public Schools ("CPS") teacher, filed this action pursuant to 42 U.S.C § 1983 against Defendant Trista Harper, the principal at the CPS high school where Sorescu worked. Plaintiff claims Defendant retaliated against her for engaging in speech protected under the First and Fourteenth Amendments when she provided information to a reporter and to investigators regarding alleged student attendance data manipulation by school administrators. Presently before us is Defendant's motion for summary judgment. For the reasons set forth below, we grant Defendant's motion.

## BACKGROUND

Unless otherwise stated, the facts described herein are undisputed and culled from the parties' Local Rule 56.1 submissions. Plaintiff is a teacher employed by the Board of Education of the City of Chicago ("Board"). (Def.'s L.R. 56.1(a)(3) Stmt. ("Def.'s SOF") (Dkt. No. 51) ¶ 1.) For approximately 15 years, she taught at Manley Career Academy High School ("Manley") until she was laid off effective October 5, 2015. (*Id.*) Plaintiff was classified as a math teacher, and she also possessed the required certification to teach computer science

courses. (*Id.*) As a CPS teacher, Plaintiff was a member of the Chicago Teachers Union Local 1 ("CTU") and was subject to the terms of the collective bargaining agreement between the Board and CTU ("CBA"). (*Id.*) The CBA governed various aspects of its members' employment relationship, including the order of layoffs for teachers and the teacher evaluation process. (*Id.*)

Plaintiff was also a member of Manley's Professional Problems Committee ("PPC") from March 2015 until she was laid off on October 5, 2015. (*Id.* ¶ 14.) Each CPS school's PPC is comprised of the principal, support personnel, and teachers. (*Id.* ¶ 13.) The PPC discusses school operations and contract administration, among other issues. (*Id.*) Through her position on Manley's PPC, Plaintiff contends she learned Manley administrators were improperly manipulating student attendance data. (*Id.* ¶ 18.) All CPS teachers are required to accurately take and maintain student attendance records. (*Id.* ¶ 10.) The parties agree that keeping accurate attendance records is vital for CPS schools, because state law provides that aid to public schools depends in part on student enrollment, which is tracked through daily attendance records. (*Id.* ¶ 11.)

In June 2015, Plaintiff and two fellow Manley teachers met with Kate Grossman, a news reporter, in order to share their allegations of attendance record fraud at Manley. (*Id.* ¶ 17.) Plaintiff provided Grossman with documents, including student attendance data, and she and Grossman spoke multiple times by phone and email following their initial meeting. (*Id.*) On July 6, 2015, *The Atlantic* published Grossman's article, "What Schools Will Do to Keep Students on Track." (*Id.* ¶ 19.) Citing attendance records provided by three teachers, the article claimed administrators at Manley frequently changed absences marked by teachers as "unexcused" to "school function" in order to boost attendance data for the school. (*Id.*) As

sources, the article identified Marilyn Parker and two additional teachers (one of which was Plaintiff) who had requested anonymity. (*Id.*) The article also stated that the Board's Office of Inspector General ("OIG") was investigating Manley as a result of the alleged attendance data manipulation. (*Id.*)

Defendant was hired as interim principal at Manley in July 2014 and has served as a contracted principal at Manley since May 2015. (*Id.* ¶ 2.) She learned about the article the day it was published, but at that time, she did not know the identity of the two teachers who had requested anonymity. (*Id.* ¶¶ 20–21.) Defendant claims she first learned that Plaintiff was one of Grossman's sources when Grossman told her so on a call shortly after Plaintiff was laid off. (*Id.* ¶ 21.) Defendant further contends that she never spoke with Plaintiff about the Grossman article, nor did she discuss any of the issues raised in it, including the alleged attendance data manipulation, with Plaintiff prior to its publication. (*Id.* ¶ 22.)

After the Grossman article was published, OIG approached Plaintiff and requested to interview her regarding attendance issues. (*Id.* ¶¶ 25–26.) OIG is tasked with "the authority to conduct investigations into allegations of or incidents of waste, fraud, and financial mismanagement in public education within the jurisdiction of the board by a local school council member or an employee, contractor, or member of the board or involving school projects managed or handled by the Public Building Commission." (*Id.* ¶ 23 (citing 105 ILCS 5/34–13.1).) Pursuant to the Board's rules and Illinois state law, all CPS teachers are required to cooperate in OIG investigations. (*Id.* ¶ 24.) Consistent with these rules, Plaintiff met with OIG investigators to discuss the attendance manipulation allegations on July 17, 2015. (*Id.*) At their request, Plaintiff met with the OIG investigators again on September 17, 2015. (*Id.* ¶ 28.)

Plaintiff alleges that following her reports to Grossman and OIG, Defendant took retaliatory measures against her. First, Plaintiff alleges that on July 23, 2015, she was asked to fill out a new request form to access a CPS computer system called Oracle. (*Id.* ¶¶ 29–31.) Plaintiff was technology coordinator at Manley, and she was one of a select few CPS teachers with access to Oracle, which is used for several purposes, including inventory recordkeeping. (*Id.*) Defendant contends that Plaintiff needed to complete a new access form because "there was an issue with the inventory recordkeeping" Plaintiff performed and she wanted Plaintiff "to make sure she had all necessary access to the Oracle system so that the inventory recordkeeping issue could be resolved." (*Id.* ¶ 31.) Although Plaintiff confirmed that her Oracle access was ultimately "fine," and she never lost access, Plaintiff argues the incident nevertheless is evidence that Defendant was attempting to interfere with her access in retaliation for her reports of attendance fraud as it followed on the heels of her statements to Grossman and OIG. (Pl.'s Rule 56.1(b)(3)(B) Resp. (Dkt. No. 82) ¶¶ 32–34.)

Second, in August 2015, despite Plaintiff's stated preference to teach geometry, Algebra I and II, and advanced placement statistics, Defendant instead assigned her to teach three computer science courses and two geometry classes. (*Id.* ¶¶ 40–42.) Manley was participating in a new CPS computer science initiative called CS4All, which Defendant hoped to turn into a three-year career technical education ("CTE") program. (*Id.*) Defendant contends that the three-year CTE program required a state-certified computer science teacher to teach the second and third year curriculum, and Plaintiff was the only teacher at Manley possessing the necessary certification. (*Id.* ¶ 41; Suppl. Harper Decl. (Dkt. No. 102–2) ¶¶ 6–12.) Defendant also intended for Plaintiff to teach an advanced placement statistics course, but Manley did not ultimately offer the course during the fall 2015 semester. (Def.'s SOF ¶ 43.) Plaintiff asserts

4

that while she experienced no pay cut as a result of being assigned to teach computer science, she understood the reassignment to put her at a greater risk for a reduction in force because computer science courses are electives. (Pl.'s Rule 56.1(b)(3)(B) Resp. ¶ 42.)

Third, Plaintiff contends Defendant interfered with her access to Gradebook, CPS's computer attendance-tracking program. (Def.'s SOF ¶ 35.) Plaintiff claims she was unable to access Gradebook twice in the fall of 2015, including the first day of school, September 8, 2015 and again on September 15, 2016. (*Id.* ¶¶ 36–39.) Plaintiff complained to Defendant about her Gradebook access issues and they were resolved both times within 24 hours. (*Id.*) While Plaintiff concedes that she does not know if her inability access Gradebook was intentionally caused by Defendant, Plaintiff claims that the denial is further evidence of retaliation, particularly since it prevented her from viewing or reporting on any allegedly fraudulent attendance changes. (Pl.'s Rule 56.1(b)(3)(B) Resp. ¶¶ 36–39.)

Finally, Plaintiff claims Defendant chose her position for closure and ultimately laid her off in retaliation for her reports to Grossman and OIG. It is undisputed that a significant decrease in enrollment at Manley for the 2015–2016 school year resulted in a $556,000 budget deficit and necessitated teacher layoffs. (*Id.* ¶¶ 48–49, 51.) Harper learned 10 days into the fall semester that only 60 freshman had enrolled, contrary to expectations that Manley would have 235 incoming freshman. (*Id.* ¶ 48.) Based on a CPS report Defendant received on September 25, 2015, she determined four to five teacher positions would need to be cut by September 29, 2015 to balance the budget.[1] (*Id.* ¶ 50.) When teaching positions must be closed

---

[1] Plaintiff denies this fact "to the extent that it suggests that Harper had not considered cutting positions until September 25, 2015," but because she provides no citations to the record or evidence for this conclusory response, we do not consider it. *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012).

for budgetary reasons, CPS principals must assess student needs and identify the positions to close, subject to approval from the human resources department, which ensures the CBA provisions are complied with. (*Id.* ¶ 55; Taylor Decl. (Dkt. No. 102–4) ¶¶ 3–6.)

Defendant contends she analyzed which departments were overstaffed in light of the reduced enrollment, assessed student needs, consulted the master class schedule, discussed with Assistant Principal Melinda Jean-Baptiste,[2] and determined that four regular (not special education) teacher positions could be closed, including two English, one math, and one CTE position. (*Id.* ¶ 56.) In determining which positions to close, Defendant's recommendations were subject to final approval from Human Resources and compliance with with Appendix H of the CBA, which governs teacher layoffs. (*Id.* ¶ 57–58; *see also* Taylor Decl. (Dkt. No. 102–4) ¶¶ 3–7.) Appendix H sets forth the order of layoffs within a unit based on teachers' certifications, evaluation ratings, tenure status, and seniority. (Def.'s SOF ¶ 57.)

Defendant identified Plaintiff's position as the math position to be closed. (*Id.* ¶ 58.) At the time, Manley only employed four certified math teachers: Plaintiff and three others. (*Id.* ¶ 59.) Defendant contends she selected Plaintiff's math position for closure because it was her only choice under the circumstances and the governing CBA. Defendant asserts that two of the math teachers were needed to teach other required classes, and therefore, they could not be laid off. (*Id.* ¶ 61–62.) And while both Plaintiff and the remaining math teacher were tenured, that teacher had a higher evaluation rating, and pursuant to the CBA, tenured teachers with lower ratings must be laid off before tenured teachers with higher ratings. (*Id.* ¶ 63.)

---

[2] Plaintiff denies that Defendant consulted with Jean-Baptiste, but the evidence she cites does not support her assertion. (*See* Pl.'s Rule 56.1(b)(3)(B) Resp. ¶ 56.)

Plaintiff also asserts that Defendant excluded her from a local school council ("LCS") meeting in retaliation for her speech. The LCS meeting was scheduled for September 30, 2015 in the wake of the budget crisis. (*Id.* ¶¶ 52–53.) While LCS meetings were generally open, at times the Manley LCS held closed meetings. (*Id.*) The parties dispute whether the September 30, 2015 meeting was labeled as "closed" or "special," and they do not agree on the significance of the wording: Plaintiff contends the meeting was labeled a "special" LCS session to discuss the 2015–2016 budget, but that it was not designated as "closed" as such meetings had been labeled in the past. (Pl.'s Rule 56.1(b)(3)(B) Resp. ¶¶ 52–53.) In any case, the meeting was closed to the public and only LCS members were allowed to attend. (Def.'s SOF ¶ 54.)

Shortly thereafter, Defendant emailed her final recommendations for position closures to Jerry Taylor, a CPS Human Resources Specialist, on October 2, 2015. (*Id.* ¶ 65.) After Taylor confirmed the recommendations complied with Board policy and the CBA, Plaintiff's position was closed and she was laid off effective October 5, 2015. (*Id.* ¶ 66.) Plaintiff was ultimately rehired by CPS as a computer science teacher at Lake View High School in 2016. (*Id.* ¶¶ 1, 67.)

Plaintiff filed her complaint in federal court on November 13, 2015 alleging Defendant violated 42 U.S.C. § 1983 by taking actions against her in retaliation for exercising her rights under the First and Fourteenth Amendments. (Compl. ¶¶ 29, 31–32, 36.) Specifically, Plaintiff alleges Defendant retaliated against her by (1) assigning Plaintiff to teach computer science classes during the 2015–2016 school year and canceling her advanced placement statistics course; (2) closing Plaintiff's math position and causing her to be laid off effective October 5, 2015; (3) requesting that Plaintiff prepare a new request form for access to the Oracle system; (4) interfering with Plaintiff's ability to access Gradebook on two occasions during

7

fall 2015; and (5) barring Plaintiff from attending the LCS meeting on September 30, 2015. (Compl. ¶¶ 18, 21, 31–32.)

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted). In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e)(2). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). We view the record in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor. *Id.* at 255, 106 S. Ct. at 2513; *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007) (citation omitted).

**ANALYSIS**

"The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits a public employer from retaliating against an employee for engaging in protected speech." *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 376 (7th Cir. 2009). "To establish a claim for retaliation in violation of the First Amendment, a public employee must prove that: (1) his speech was constitutionally protected, (2) he has suffered a deprivation likely to deter speech, and (3) his speech was at least a motivating factor in the employer's action." *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013) (citing *Peele v. Burch*, 722 F.3d 956, 959 (7th Cir. 2013)). "If a plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that it would have taken the same action in the absence of the protected speech." *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 670 (7th Cir. 2009). "If the employer carries this burden, the plaintiff may still reach trial by producing sufficient evidence to allow a reasonable fact finder to determine that the employer's reasons were merely a pretext for firing the employee, at least in part, for exercising her First Amendment rights." *Id.*

**I.      CONSTITUTIONALLY PROTECTED SPEECH**

The determination of whether speech is constitutionally protected is a question of law. *Connick v. Meyers*, 461 U.S. 138, 147–48, n.7 (1983); *Kubiak v. City of Chi.*, 810 F.3d 476, 481 (7th Cir. 2016); *Houskins v. Sheahan*, 549 F.3d 480, 489 (7th Cir. 2008). To receive First Amendment protection, a public employee must speak "as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S. Ct. 1951, 1958 (2006); *Clarke*, 574 F.3d at 377. In addition, the employee's interest in expressing that speech must not be "outweighed by the state's interests as an employer in "promoting effective and efficient public service.'" *Swetlik*, 738 F.3d at 825 (quoting *Houskins*, 549 F.3d at 490). Thus, we must engage in a balancing test to determine "the interests of the teacher, as a citizen, in commenting

upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 1734–35 (1968).

    A.    **Private Citizen**

Defendant first argues that Plaintiff's statements are not entitled to the protection of the First Amendment because she did not speak as a private citizen. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421, 126 S. Ct. at 1960; *accord. Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007) ("*Garcetti* made clear that public employees speaking 'pursuant to their official duties' are speaking as employees, not citizens, and thus are not protected by the First Amendment regardless of the content of their speech."). However, speech "does not lose protection simply because it 'concerns' or is 'acquired by virtue of [the citizen's] public employment.'" *Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 793 (7th Cir. 2016) (quoting *Lane v. Franks*, ––– U.S. –––, 134 S. Ct. 2369, 2379 (2014)). "The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 134 S. Ct. at 2379; *see also Houskins*, 549 F.3d at 490 ("Determining the official duties of a public employee requires a practical inquiry into what duties the employee is expected to perform, and is not limited to the formal job description." (citation omitted)); *Kristofek*, 832 F.3d at 793 ("For the speech to lack constitutional protection, it must constitute government employees' work product that has been commissioned or created by the employer." (internal quotations omitted)).

Defendant argues Plaintiff admitted that she learned about the alleged attendance fraud in her capacity as a PPC member, and in that role, she was responsible for reporting improper

10

manipulation of attendance data to both OIG and the press. (Def.'s Mem. at 8.) Therefore, Defendant argues, she was acting pursuant to her duties as a public employee, not speaking as a private citizen, and her reports are not constitutionally protected as a result. (*Id.*)

There is no dispute that the alleged attendance issues came to Plaintiff's attention in her role as a member of the Manley PPC. (Def.'s SOF ¶ 18.) However, Plaintiff's responsibilities in reporting to OIG versus to Grossman diverge. With respect to her reports to OIG, it is undisputed that OIG contacted Plaintiff to interview her regarding attendance issues, and Plaintiff was required to cooperate with OIG investigations pursuant to Board rules and state law. (*Id.* ¶¶ 24–25.) Moreover, the parties do not dispute that CPS teachers' job duties required accurate recording of student attendance during each class. (*Id.* ¶¶ 10–11.) Plaintiff also conceded that as part of her job duties, she is expected to report other CPS employees when she observes them violating the law. (*Id.* ¶ 26.) Indeed, Plaintiff does not appear to contest Defendant's argument that her reports to OIG were not protected by the First Amendment. (*See* Pl.'s Resp. at 4–6.) Accordingly, insofar as Plaintiff claims she was retaliated against for her comments to OIG, her claim must fail, as such speech was made pursuant to her duties as a public employee, and it is therefore not entitled to First Amendment protection. *Garcetti*, 547 U.S. at 421, 126 S. Ct. at 1960; *Spiegla*, 481 F.3d at 965.

However, Plaintiff also contends she was retaliated against on account of her statements to Grossman. Construed favorably to Plaintiff, these statements were made in her capacity as a private citizen, not pursuant to her official duties as a teacher or a Manley PPC member. *See Morales v. Jones*, 494 F.3d 590, 598 (7th Cir. 2007) (recognizing that pursuant to *Garcetti*, the same speech said to a different individual may be entitled to protection). It is a "settled principle that if a public employee reports official misconduct in the manner directed by official policy, to

11

a supervisor, or to an external body with formal oversight responsibility, then the employee speaks pursuant to her official duties and her speech is unprotected by the First Amendment." *Spalding v. City of Chi.*, 186 F. Supp. 3d 884, 904–05 (N.D. Ill. 2016) (collecting cases). "By contrast, if an employee . . . reports misconduct outside established channels or in violation of official policy, she speaks as a private citizen and her speech is constitutionally protected." *Id.*

Defendant relies on the deposition of CTU Field Representative Glen Kugler, who testified that it was his understanding that Plaintiff and the other teachers obtained information about attendance fraud from the Manley PPC. (Def.'s SOF ¶ 18.) But the fact that Plaintiff learned of alleged attendance irregularities through her PPC position does not alone strip her reports to Grossman of First Amendment protection. *Kristofek*, 832 F.3d at 793 (finding the fact that a public employee's statements "bore some relation to the subject matter of his job is not dispositive"). "[S]peech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." *Lane*, 134 S. Ct. at 2379; *accord. Pickering*, 391 U.S. at 572, 88 S. Ct. at 1736 (observing that "[t]eachers are . . . the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent" and "it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal"). Moreover, Plaintiff disputes Defendant's evidence that the teachers met with Grossman pursuant to any duty as PPC members—rather, she claims her responsibilities as a PPC member only required her to report issues internally. (Sorescu Aff. ¶ 2.) The fact that Plaintiff spoke to Grossman on condition of anonymity and was not identified as a PPC member in the article further supports a conclusion that Plaintiff was not speaking pursuant to any official duties. Thus, to the extent that Plaintiff's

retaliation claim is based on her statements to Grossman, she was speaking as a citizen for First Amendment purposes. *Garcetti*, 547 U.S. at 421, 126 S. Ct. at 1960.

B. **Matter of Public Concern**

To be protected, speech also must involve a matter of public concern. *Kristofek*, 832 F.3d at 794 (citing *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 83, 125 S. Ct. 521, 525–26 (2004)). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S. Ct. at 1690. "[P]ublic employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers. . . . Were they not able to speak on these matters, the community would be deprived of informed opinions on important public issues." *Roe*, 543 U.S. at 82, 125 S. Ct. at 525. Here, there is no dispute that Plaintiff's speech to Grossman concerned a matter of public concern. *See, e.g.*, *Thompson v. Bd. of Educ. of the City of Chi.*, 711 F. Supp. 394, 402 (N.D. Ill. 1989) (citing evidence establishing the "quality of education and conditions in the Chicago public schools constitute matters of vital public concern").

C. *Pickering* **Balancing Test**

Notwithstanding that Plaintiff's reports to Grossman were made as a citizen on a matter of public concern, for her speech to be protected under *Pickering*, "the employee's interest in making the speech must outweigh the employer's interest in 'promoting the efficiency of the public services it performs through its employees.'" *Swetlik*, 738 F.3d at 827 (quoting *Hernandez v. Cook Cnty. Sheriff's Office,* 634 F.3d 906, 914 (7th Cir. 2011)); *Pickering*, 391 U.S. at 568, 88 S. Ct. at 1734–35. "If not, the employer's action is considered to be justified and does not violate the First Amendment." *Id.* "The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any

other member of the general public." *Garcetti*, 547 U.S. at 418, 126 S. Ct. at 1958. For example, where a public employee's statements were false or made with knowing or reckless disregard for the truth, they may not be entitled to First Amendment protection under the *Pickering* balancing test. *Swetlik*, 738 F.3d at 827.

The Seventh Circuit has identified certain additional factors that should be considered when determining whether the government's interest outweighs the First Amendment interests of a public employee, including (1) whether the speech would create problems in maintaining discipline or harmony among coworkers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place, and manner of the speech; (5) the context within which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public. *Graber v. Clarke*, 763 F.3d 888, 896 (7th Cir. 2014) (quoting *Gustafson v. Jones*, 290 F.3d 895, 909 (7th Cir. 2002)). In balancing the employee's protected speech against the government's interests, it is unnecessary to address each factor. *Id.*

Defendant argues that Plaintiff has not shown that her interests as a citizen in commenting upon matters of public concern outweighs the Board's interest in promoting the efficiency of the public services it performs through its employees. (Def.'s Mem. at 9.) Defendant argues Plaintiff "went behind Harper's back to the press and accused her of improperly manipulating student attendance data to make Manley look better," which created the "potential for disharmony in the workplace." (*Id.*) While the parties agree that in "an ideal world," CPS principals and teachers are supposed to look out for one another to avoid potential conflicts that could adversely affect students, they disagree as to whether and to what extent

Plaintiff's reports caused any conflict and whether it was justified.  (*See, e.g.*, Def.'s SOF ¶¶ 8–9; Pl.'s Rule 56.1(b)(3)(B) Resp. ¶¶ 8–9.)

Plaintiff's interest in making her statements to Grossman, although "critical of [her] . . . employer but which are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of [her] daily duties in the classroom or to have interfered with the regular operation of the schools generally," tend to outweigh Defendant's interest in limiting her speech.  *Pickering*, 391 U.S. at 572–73, 88 S. Ct. at 1737 (further finding "absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment").  In addition, the time, place, and manner of Plaintiff's speech was generally appropriate as Plaintiff disclosed information to Grossman during the summer recess and without interfering with the school's operations.   Likewise, as discussed, Plaintiff's speech touched on a matter of public concern.  Considering all of the *Pickering* factors, we cannot conclude as a matter of law that Plaintiff's interest in speaking with Grossman was outweighed by Defendant's interests as an employer in "promoting effective and efficient public service."  *Pickering*, 391 U.S. at 568, 88 S. Ct. at 1734–35; *Swetlik*, 738 F.3d at 827.

## II. CAUSAL CONNECTION

However, even if constitutionally protected, Plaintiff has not shown her speech to Grossman was a motivating factor causing her layoff or the other allegedly retaliatory acts she complains of.  To establish a prima facie case, a public employee must prove that the constitutionally-protected speech was a motivating factor for the retaliation.  *Peele*, 722 F.3d at 960 ("The plaintiff has the initial burden to produce evidence that his speech was at least a motivating factor in the employer's decision to take adverse action against him— or, in philosophical terms, a sufficient condition of the retaliation." (internal quotations

omitted)); *Vose v. Kliment*, 506 F.3d 565, 569 (7th Cir. 2007) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977)). "The defendant may then rebut that evidence by demonstrating that 'the harm would have occurred anyway,' even without the protected conduct—or, in other words, 'that his conduct was not a *necessary* condition of the harm.'" *Peele*, 722 F.3d at 960 (quoting *Greene v. Doruff*, 660 F.3d 975, 980 (7th Cir. 2011) (emphasis in original)). Plaintiff must produce "specific, nonconclusory allegations reasonably linking her speech to employer discipline," and she must do more than show that the defendant was displeased by her speech. *Wright v. Illinois Dep't of Children & Family Servs.*, 40 F.3d 1492, 1500–01 (7th Cir. 1994) (internal quotations omitted).

Plaintiff cannot sustain her claim, because Defendant has presented uncontroverted evidence that she did not learn that Plaintiff was one of the anonymous sources for the Grossman article until after Plaintiff was already laid off. (Def.'s SOF ¶ 21.) During a call several days after Plaintiff's layoff, Grossman told Defendant for the first time that Plaintiff was one of the unnamed teachers cited in *The Atlantic* article. (*See* Harper Decl. (Dkt. No. 53–2) ¶ 18; Harper Dep. (Dkt. No. 53–3) at 42–43). Plaintiff never otherwise told Defendant that she was one of Grossman's sources. (Harper Decl. ¶ 20.) While Plaintiff claims that Jean-Baptiste may have told Defendant that Plaintiff was "likely an anonymous teacher," Plaintiff has failed to

support this allegation with any evidence in the record.[3] As there is no genuine dispute of material fact that Defendant did not learn that Plaintiff was a source for the Grossman article until after she was already laid off, her speech could not have been a motivating factor for her layoff or for any of the other allegedly retaliatory actions that preceded it, including her denial of access to Oracle and Gradebook, her course reassignment, or her exclusion from the LCS meeting. Because Plaintiff has failed to marshal evidence to establish this essential element of her prima facie case, we must grant Defendant's motion for summary judgment.

## CONCLUSION

For the foregoing reasons, we grant Defendant's motion for summary judgment. (Dkt. No. 50.) It is so ordered.

_Marvin E. Aspen_

Honorable Marvin E. Aspen
United States District Judge

Dated: May 10, 2017
Chicago, Illinois

---

[3] Plaintiff's response brief, response to Defendant's Statement of Facts, and her own Statement of Additional Facts all repeatedly cite pages of the Jean-Baptiste deposition that appear nowhere in the record. (Pl.'s Resp. Br. at 9; Pl.'s Rule 56.1(b)(3)(B) Resp. ¶ 21; Pl.'s Rule 56.1(b)(3)(C) SOAF (Dkt. No. 84) ¶ 16.) We only rely on a party's facts to the extent that they are supported by evidence in the record. *Keeton*, 667 F.3d at 880. Moreover, we are entitled to strictly enforce compliance with Local Rule 56.1. *See Stevo v. Frasor,* 662 F.3d 880, 886–87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings."); *Patterson v. Ind. Newspapers, Inc.,* 589 F.3d 357, 360 (7th Cir. 2009) ("We have repeatedly held that the district court is within its discretion to strictly enforce compliance with its local rules regarding summary-judgment motions."); *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) (district courts have broad discretion to strictly enforce Local Rule 56.1); *Banks v. Fuentes*, No. 07 C 784, 2012 WL 6184880, at *2 (N.D. Ill. Dec. 11, 2012) ("Whether they seek or oppose summary judgment, parties have a right to expect that Local Rule 56.1 will be enforced and that facts not properly presented under the rule will be disregarded.").

17